INHABITANTS OF NEWBURYPORT *vs.* COUNTY COMMISSIONERS OF ESSEX.

The list of estates, real and personal, which the inhabitants of towns are required to present to assessors, before an assessment of taxes is made, is not intended to contain a statement of the estimated value of the property; and if the list contains a statement of the value, such statement is not, by § 22 of that chapter, conclusive on the assessors ; but they are to exercise their own judgment in estimating the value of the property.

SHAW, C. J.   This case comes before the court on a petition presented by the inhabitants of Newburyport, praying for a writ of *certiorari*, to remove the proceedings of the county commissioners, in regard to a tax on the real estate of the Bartlett Steam Mills, a corporation doing business in that town.   It presents an exceedingly important question, affecting the mode of levying and assessing taxes on all the real and personal estate of the Commonwealth, for all purposes. The great question is, whether the list or statement of property, which each taxable inhabitant is called upon by law to give in to the assessors, previously to the assessment of a tax, is intended to contain a statement of the estimated value of the property, or only the kind, description and quantity of his taxable property ; and if it be the intention of the law

that the list shall contain such statement of the value of the property, whether the statement shall, in that respect, be conclusive.

It appears by the undisputed facts stated in the petition and in the commissioners' answer, that the Bartlett Steam Mills, in 1845, pursuant to the notice of the assessors, seasonably gave in to the assessors a statement of their real estate, by their treasurer, valuing the same at $60·000. The assessors, when they came to make their assessment, valued the same real estate at $98·000, and apportioned the tax accordingly. After the assessment was made, the company applied to the assessors to abate this tax, and the assessors afterwards gave them notice, that they had consented to take off $10·000 from the estimated value of the estate, and apportion the tax accordingly. This the company did not accede to, but applied to the county commissioners to reduce the tax, according to the provision of the Rev. Sts. *c.* 7, § 39.

At the hearing before the commissioners, the parties were heard by their counsel. The counsel for the company contending, as they have contended here, that the valuation of the company by their treasurer was conclusive, and that it was not competent for the assessors, either upon other evidence of value offered to them, or in the exercise of their own judgment, on the ground of any supposed error in judgment on the part of the company, to fix the value at a higher rate than that fixed by the list or invoice given in. The counsel for the inhabitants, insisting that the list was not conclusive, asked leave to introduce evidence of the value, either market or relative value, of the said real estate, for the purpose of showing that the company, in their invoice so carried in to the assessors, had erred in their judgment of the actual or relative value of said real estate. The commissioners, regarding the evidence, as offered for the purpose of showing merely an error in judgment as to the value, and not an omission of a substantive and distinct subject of taxation, held and ruled that the evidence was inadmissible for that purpose, and adjudged the valuation contained in the invoice

so carried in, to be the true valuation of the said real estate, and abated the tax on the excess, to the amount of $247. Several minor questions were raised, which are immaterial. We think it sufficiently appears that the invoice, which was carried in, contained a proper and intelligible description of the real estate; that no exception was taken to it at the time; and that the treasurer, who carried it in, was not required to swear to the truth of it, by the assessors, or either of them.

The argument in behalf of the company is founded on the terms of the Rev. Sts. c. 7, § 22. The prior § 19 had directed that the assessors, before proceeding to make any assessment, should give seasonable notice to the inhabitants, which notice should require them to bring in to the assessors, within a time therein specified, true lists of their polls and estates, both real and personal, not exempted from taxation. Section 22 then enacts, that "the assessors shall receive, as the true valuation of the property of each individual, the list, if any, brought in by him, unless he shall, on being thereto required by the assessors, refuse to make oath that the same is true."

If this section be taken, or if the word "valuation" therein contained be used, in the sense which it often bears, as "appraisement," the setting or estimating of the "value" of any thing, it would certainly afford a very strong support to the respondents' argument. But the conclusion from this exposition of the statute would be, that every inhabitant may determine for himself, for what property he will be taxed, and at what rate it shall be appraised, and thus in effect determine what tax he will pay, subject only to this exception, that, *if required*, he shall refuse to swear to the truth of the list given in. Upon this hypothesis, if required, and he actually makes oath to the truth of it, it is conclusive, both as to the quantity of property and its value; and there is no restraint upon undervaluation, except, perhaps, a fear of prosecution for perjury. Rev. Sts. c. 128, § 2. But no prosecution for perjury could be maintained, unless the estimate were so grossly false, as to charge the party with wilful and

corrupt false swearing. A list, however, might be greatly deficient in quality, and grossly undervalued, and yet not be sufficient to convict a party of wilful and corrupt perjury. But even a conviction for perjury would afford no relief to those who would be overtaxed by such fraudulent undervaluation.

Such being the consequences of what would seem to be a literal construction, we have been led to inquire, whether it is the necessary and true construction, and for this purpose to compare it with other parts of the revised statutes, other statutes *in pari materia*, and the more ancient statutes from which these were drawn. The section in question, being § 24 in the report, was reported by the commissioners in a different form, thus : " The assessors shall receive as the true valuation of the property of each individual the list, if any, brought in by him, unless they shall find some error therein, in which case they shall correct such error, and make their assessments accordingly." This, it will be perceived, is entirely different from the clause as it stands, which is, " unless he shall, on being required, refuse to make oath that the same is true."

Had it stood as reported by the commissioners, it would have been open to the assessors, to inquire both as to the amount of property returned, and the value, making the return by the tax-payer *prima facie* evidence of these facts, but not conclusive, inasmuch as it might be corrected by the assessors on the proof or discovery of error.

But further to elucidate this provision, it is proper to go back to the statute, to which the commissioners refer, as the clause from which this provision was revised. *St.* 1785, *c.* 50, § 9. There we find, after similar directions, in regard to notice to the inhabitants to bring in true and perfect lists of their polls and estates, it provides that if the assessors suspect any falsehood in the list, they, or either of them, shall require the person to make solemn oath that the list is true ; and such list, being exhibited on oath, shall be a rule for that person's proportion of the tax, which the assessors may not

exceed, unless they shall discover any error therein, in which case they are authorized and directed to assess such articles as shall appear to be kept back.

This last clause, we think, throws light upon the question ; indicating, with the other provisions of the statute, what the tax-paying inhabitant is to do, and what the assessors are to do. The inhabitants are to be warned by the assessors to bring in to them true and perfect lists of their polls, and of all their estates, both real and personal, &c. with a caution that no one, who has not brought in such list, shall be admitted to apply to the court of sessions for an abatement, without a good excuse. The act to be done by the tax-payer, is to bring in a true and correct list; but it does not require in terms, or by implication, that the value shall be set down, estimated, or in any way stated. If the object is to have a statement of taxable property, the list is true and correct, if it is true in the enumeration, description and specification of the real and personal property embraced. That such is the effect of the terms " true and perfect," in this clause, is indicated by the converse of this, when it is erroneous ; and it is erroneous when any articles shall appear to have been kept back. If appraisement, or estimate of value, were part of the list, then it would be erroneous, if articles were undervalued ; which is nowhere intimated. In considering what is to be done by assessors, the same statute gives various directions. Section 1 provides for the annual election of assessors, to be assessors of all such rates and taxes as the general court shall order, towards the charges of the government, who shall also be the assessors of county, town and district taxes. They are to be sworn ($ 5) to proceed equally and impartially, according to their best skill and judgment, in assessing and apportioning all such rates and taxes, &c. By $ 1, the assessors, so chosen and sworn, shall assess the polls of, and estates within such town, their due proportion of any tax, according to the rules, &c. and lodge in the clerk's office the invoice, or valuation, from whence the rates or assessments are made. Section 10 provides that if

any person be aggrieved at the sum set and apportioned upon him, and shall make it appear that he is rated more than his proportion, the assessors shall make a reasonable abatement; or if they refuse, if he make it appear to the court of sessions that he is overrated, he may be relieved and shall be reimbursed.

The fair conclusion, from the various provisions of the act which was in force up to the time of the passing of the revised statutes, is, that the list to be given in was to embrace the enumeration and description of all the taxable property of the person giving it; and if an estimate of the value was added by the owner, or a statement of his own view of the rate at which he supposed it should be estimated in the valuation, it was gratuitous, and not required by law. But that it was the province and duty of the assessors to appraise, estimate and value the property so given in, according to their best skill and judgment; and if any value was stated therein by the person giving it in, it was to assist, not to control, the judgment of the assessors.

If such was the law on this great subject of taxation, which so deeply interests every inhabitant of the Commonwealth, we are next to inquire, whether it was the intention of the legislature, in the revised statutes, so far to alter it as to provide that every person, in giving in his list, might annex to it his own arbitrary estimate of its value, and make that estimate binding upon assessors, though they might be assured by their own knowledge, or by the most satisfactory evidence, that it was erroneous or fraudulent.

It is manifest that no such intention is to be found in the doings of the commissioners. Their report, as we have seen, made the return of the tax-payer subject to correction by the assessors, if any error should be found in it. Nor does the change appear to have been proposed by the legislative committee who revised the report of the commissioners.

In order to ascertain whether it was the intention of the legislature, by the section in question, so essentially to change the then existing law, it becomes necessary to examine the

other parts of the revised statutes, and the earlier laws, indicating the course of policy of the government upon the subject of taxation.

State, county and town taxes, to be raised by an equal assessment upon polls and estates, have been familiar to the people of Massachusetts from the earliest times. Colony Ordinance, 1651. Anc. Chart. 69. By the statute regulating townships, almost immediately after the establishment of the provincial government, 1692, the selectmen were empowered to assess the inhabitants and residents, and the lands and estates, lying within the bounds of each town, in just and equal proportion, as near as might be, each particular person according to his known ability and estate, and make lists, &c. Here, also, it was provided, that if any one should think himself overrated, and make it to appear to the assessors, he should be eased ; and if they refused, he might apply to the court of sessions, who were empowered to rectify the same. Anc. Chart. 249, 250. Up to this time, no provision was made for the election of assessors, but the selectmen acted in this capacity. Two things are manifest as leading objects ; that all taxes should be equal upon all inhabitants, according to their estate and ability ; and that this should be determined by the judgment and decision of the persons assessing, subject only to be revised by the justices in sessions. The subject was again considered in the provincial act of 1730, which provided for the choice of separate assessors, who were to be sworn, that in assessing and apportioning such rates and taxes, they would proceed equally and indifferently, according to their best skill and judgment, according to the rules prescribed, &c. This act contained a provision, like the former one, that if any one could demonstrate that he was rated more than his proportion, he should be eased by the assessors ; otherwise, he might be relieved by the court of sessions. Anc. Chart. 472, 475. In all these provisions, the terms "assess," "apportion," &c. as acts to be done by assessors, manifestly imply the application of skill and judgment by them, in setting a value, for the purpose of

taxation, and for establishing an equality of taxation upon the property to be taxed. Indeed, the early colony law, above cited, stated a certain rate at which cattle should be fixed; that houses and land should be at an equal and indifferent value. The estates of merchants, shopkeepers and factors, were to be assessed by the rule of common estimation, according to the will and doom of the assessors, having regard to their stock or estate; and if any such merchants found themselves overvalued, if they could make it appear to the assessors, they were to be eased by them; if not, by the next county court. Anc. Chart. 70.

It thus appears, that up to the time of the adoption of the present constitution, the "assessment," "apportionment," "rating," "overrating and underrating," as the acts of assessors, had acquired a fixed and well understood meaning — that of determining, by a *quasi* judicial act, the portion which each one should contribute, of a fixed sum to be raised, according to each man's ability, regulated by the value of his real and personal property, as estimated by the judgment of the assessors.

The constitution (*c.* 1, § 1, art. 4,) recognizes the right and authority of the general court to impose and levy *proportional and reasonable assessments, rates and taxes,* upon all the inhabitants of, and persons resident and estates lying within, the Commonwealth. It also provides that while the public charges shall be assessed on polls and estates, in the manner hitherto practised, in order that such assessments may be made with equality, there shall be a valuation of estates within the Commonwealth, taken anew once in every ten years at least, and as much oftener as the general court shall order.

Here the provisions of the constitution manifestly imply that the assessment of a tax is something more than the mere apportionment, by an arithmetical process, of a sum of money, upon property, the aggregate of which, as well as each man's share, is fixed absolutely by the owners themselves; but it is levying or imposing a tax by the government, or officers

appointed by law, upon property, the value of which, both in the aggregate and each person's share of it, is ultimately fixed by appraisement by officers, elected with a view to their skill and judgment, and sworn to a faithful discharge of their duty.

This view of the legislation and practice of the State before the adoption of the constitution, and recognized by it, confirms the conclusion to which we before came, in construing the early statute of 1785, that the " valuation " therein contemplated was the act of the assessors, and that the return of the list of property therein provided for was intended to aid the assessors in ascertaining the nature, quantity and extent of the property to be valued and assessed, and not to control them in the estimate of its value.

With these views of the general legislation we are brought to examine more carefully the provisions of the revised statutes, on which the question turns. In doing so, it is proper to examine every provision, clause and word, in the whole code, bearing upon the subject ; and if there is any repugnancy in its different provisions, to reconcile them, if practicable, by a reference to the policy and general purposes of the law providing for a system of equal taxation upon property.

By Rev. Sts. c. 7, § 2, " all property, real and personal, of the inhabitants of this State, not expressly exempted by law, shall be subject to taxation." By § 7, " all taxes on real estate shall be assessed in the town where the estate lies," &c. By § 9, " all personal estate, whether within or without this State, shall, except in the cases enumerated in the following section, be assessed to the owner," &c. These directions imply an act to be done by assessors. The Rev. Sts. c. 15, § 33, direct that assessors shall be annually chosen by every town ; and § 55 of the same chapter indicates their duty, by the form of oath required of them, viz. that they will impartially, according to their best skill and judgment, *assess and apportion* all such taxes as they may be directed to assess. And so, by § 56, where assistant assessors are chosen, it is made their duty to assist the assessors in taking a list of the

ratable polls, and in estimating the value of the real and personal estate. They are to aid the principal assessors in doing their duty ; that duty therefore is, as fixed by the statute, to *estimate the value* of the real and personal estate to be assessed. It is not limited to the case of dooming, where no list has been given in, but is general in its terms, and applicable to all the property to be taxed. Besides ; this assessment and apportionment are to be made impartially, and according to their best skill and judgment. Upon what is this judgment to be exercised? The amount of the tax to be assessed is fixed. If the amount of the property to be taxed, both as to quantity and value, is fixed by the returns of the owners, nothing remains for the assessors but an arithmetical process, first in summing up the amounts returned, or doomed in cases where no return is made, and establishing the aggregate value of the property to be assessed ; and next, in apportioning it to each person according to his return. There would be no room for skill, or for the exercise of judgment in estimating the value of the real and personal property.

There is another series of provisions leading to the same result, to wit, that the estimate of the value of the property, made and returned by the owner, is not conclusive upon the assessors. These are the provisions for abatement of the tax of any one aggrieved, who shall complain, and show that he is taxed more than his just proportion. The Rev. Sts. c. 7, § 37, authorize assessors, in such cases, to make a reasonable abatement, and for this purpose to examine, on oath, the person complaining, and any witnesses whom he or they may see fit. It is true that this may be construed to apply to those who have given in no list, and who consequently have been doomed; but it is not so restrained in terms, nor can it be reasonably inferred that it was so intended. Such a construction would give an unfair advantage to those who have not given in their lists. They might forbear giving in such list, until they see how the assessment is made. If their property is undervalued by the assessors, they will pay the tax and say nothing ; if it is overvalued, they will have an

opportunity to complain, give their own statement on oath, and offer other evidence. But if it extends to those who have given in their lists, the inference is irresistible, that their lists are not conclusive; because, if they were, there would be no ground to allege or prove a taxation and assessment beyond the complainant's just proportion.

But the provision for an appeal to the county commissioners is expressly limited, by § 40, to those who have brought in a list of their estates to the assessors, or shall show good cause for not having so done; and by § 39, if it shall appear to the commissioners, upon the hearing of such complaint, that the complainant is overrated, the commissioners shall make such an abatement of his taxes, as they shall deem reasonable. Here there is a case of a person who has complied with the law, and given in his list, and either has sworn to the truth of it, or not been required to swear to it. The complaint is, that he is overrated, and the inquiry and judgment of the commissioners are directed to the point whether he is overrated. If his list contained an estimate of the value of his property, and that valuation was conclusive, he could not be overrated, unless the assessors had placed the value of the property at a higher rate than he had placed it in his list; which would not be an error of judgment, but a violation of law. If the sole inquiry of the county commissioners is to be, whether he is taxed for property for which he is not liable, it seems probable that the statute would have so limited the inquiry; but it is not so limited, and the complaint of being ' overrated," more significantly applies to the case of his property being estimated at too high a value in the assessment; which it could not be, if the owner's own " valuation" were conclusive.

This brings us back to inquire again, what is the true meaning of § 22, directing that " the assessors shall receive, as *the true valuation* of the property of each individual, the list, if any, brought in by him, according to the provisions of this chapter."

One supposition is, that it should be received as the true

valuation, *prima facie*, and would stand as the valuation, un.ess the assessors, in the exercise of their judgment, and by the duty imposed on them, should change it, in order to produce an equal assessment when compared with other estates embraced in the same valuation. In this sense, it would have nearly, if not exactly, the sense of the clause reported by the commissioners, viz. a true valuation, unless they should find some error therein, in which case they should correct such error, and make their assessment accordingly.

Another obvious exposition is, that the true valuation, in this clause, is used as synonymous with " list," or with the terms " invoice," " schedule," " account " of property, as used in these and other statutes upon the subject. As in the last valuation act *(St.* 1840, *c.* 78, § 4,) every person liable to be taxed shall give in a true " account," and make oath that it is a true account of all his ratable estate. So " invoice " is used as synonymous with valuation, in *St.* 1785, *c.* 50, § 1. If such be the meaning, then by " true valuation " is intended a true list of the taxable property; not a true estimate of its value. ‾ The character of the document brought in must be judged of by the anterior provision which requires it to be brought in. The notice ordered in § 19 " shall require the inhabitants to bring in to the assessors true lists of all their po.ls and estates, both real and personal, not exempted from taxation." Section 20 authorizes assessors to " require any person bringing in such a list, to make oath that the same is true ; " that is, a true list of their ratable estate. Section 21 provides that " the assessors of each town shall, at the time appointed, make a valuation of all the estates, real and personal, subject to taxation therein."

Section 22 is the one under consideration, directing that the assessors shall receive, as the true valuation, the list, unless he shall, on being required by the assessors, refuse to make oath that the same is true. The lists to be brought in, and, if required, sworn to, in this section, are manifestly those directed to be brought in and sworn to, in §§ 19 and 20, namely, a list of the ratable estate ; and the oath is, that it is

a true list of the ratable estate. The oath does not extend to the appraisement or estimate of its value. If, then, "valuation" is used, in this section, as synonymous with list, and to avoid repetition of that word, the effect is, that the list, thus to be brought in and sworn to, shall be received as a true list; and then it shall be taken as a true statement of that man's real and personal estate, and (to use the language of *St.* 1785, *c.* 50, § 9) "shall be a rule for that person's proportion of the tax, who presented the same, which the assessors may not exceed, unless they shall discover any error therein."

Upon this theory, the return would be conclusive as to the nature and amount of each one's taxable property, but not as to the value at which it should be estimated for purposes of taxation. And this would be much more consistent with the provisions of the statute requiring the oath. Whether one is the owner of real or personal estate, the number of houses or of acres, of cattle or of public stocks, are facts within his own knowledge, and therefore he may make oath to the truth of such facts, with safety. And after the assessors have cautioned him, and put all the necessary inquiries, with all the means of knowledge which the law puts within their reach, if he will deliberately make oath to the correctness of such return, in point of fact, the law may safely trust him, and for the sake of a convenient and practical rule, may adopt it as conclusive. But the estimate of the value of real and personal estate is a *quasi* judicial act; it is the exercise of skill and judgment, for which the assessors are specially chosen and sworn. Many an individual owner of property, though honest, would be wholly incapable of fixing the value of it, and might make a very wild estimate, without being exposed to a charge of wilful perjury. We think we ought not so to construe these statutes, unless we find it so provided in express terms, or by necessary implication. They are made with the avowed purpose of establishing a system of equal taxation, by a uniform rule of appraisement, as nearly as the nature of the subject will admit, by men specially trained to the knowledge and experience necessary to the performance

of that duty, and who will impartially apply the same rules of judging to the appraisement of all the property of the persons liable to taxation. But the construction contended for would practically result in a system of very unequal taxation, in consequence of the varying degrees of honesty, capacity, and information of all the persons on whom such a system is to operate. Such, we think, is not the true construction ; and taking the whole of these enactments together, the court are of opinion, that the return of the company, in the present case, was not conclusive, as to the appraisement, or estimate of value set upon the property, by their treasurer, but that it was competent for the assessors of the town, if, in their judgment, it was estimated too low, to set it at a higher rate in the valuation, for the purpose of taxation, subject to the revision of the county commissioners. We are also of opinion, as a necessary consequence, that the decision of the county commissioners, in adjudging the said return to be conclusive, and in rejecting the evidence offered to sustain the valuation of the assessors, was erroneous, and must be set aside.

*Writ of certiorari to be issued.*

*N. J. Lord,* for the petitioners.
*Hills,* for the respondents.